FILED
10/30/2023
Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE

Assigned on Briefs October 10, 2023

## STATE OF TENNESSEE v. NICOLE L. LINDHOLM

**Appeal from the Circuit Court for Wayne County**
**No. 16842     Stella L. Hargrove, Judge**

_____

### No. M2022-00790-CCA-R3-CD

_____

The Defendant, Nicole L. Lindholm, appeals the trial court's imposition of an effective five-year sentence in the Tennessee Department of Correction for her convictions for aggravated assault, a Class C felony, and reckless endangerment with a deadly weapon, a Class E felony, which followed the trial court's revocation of her probationary sentence on judicial diversion. The Defendant argues on appeal that the trial court imposed an excessive sentence and erred by denying her request for probation. Based on our review, we affirm the sentence imposed by the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and KYLE A. HIXSON, JJ., joined.

Amy Long Schisler Wilson, Lawrenceburg, Tennessee (at hearing and on appeal), for the appellant, Nicole Lynette Lindholm.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Brent A. Cooper, District Attorney General; and Patrick Butler, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

# FACTS

On June 13, 2020, the Defendant brandished a handgun at her neighbors, which led to her being indicted by the Wayne County Grand Jury with reckless endangerment with a deadly weapon and aggravated assault. On September 16, 2021, the Defendant pled guilty to both counts in the Wayne County Circuit Court and was granted a five-year probationary sentence on judicial diversion. Among the "Special Conditions" of her order of deferral on judicial diversion were that she have no contact with the victims and that she "[m]aintain use of medications and recommendations of doctors." On March 10, 2022, following a revocation hearing, the trial court revoked the Defendant's judicial diversion based, in part, on the Defendant's new charges of two counts of stalking and two counts of violation of an order of protection involving the same victims.

At the May 12, 2022 sentencing hearing, the State introduced the Defendant's presentence report, which reflected that the forty-six-year-old Defendant had no criminal history prior to the incident that led to her aggravated assault and reckless endangerment convictions. Unverified educational information provided by the Defendant was that she had obtained a juris doctorate from Novus Law School, master's degrees in psychology and Christian leadership from Fuller Seminary, and a bachelor's degree in music from Valparaiso University. The Defendant's self-reported employment history, also for the most part unverified, included online technical support positions. The Defendant listed both her physical and mental health as excellent, reporting physical health diagnoses of asthma and allergies and a mental health diagnosis of depression. The Defendant reported that she was taking Allegra, Singulair, Anoro, and Albuterol for her physical conditions and Effexor and Wellbutrin for her depression.

Victim impact statements by husband and wife Clifford and Heather Crowe revealed that the initial incident occurred when the couple was outside their home with their three children. As the couple was talking to another neighbor, the Defendant, who was dressed in military clothing and wearing a combat helmet, came out of her camper-home, yelled that she was running for president and acting as her own Secret Service security, and held up a semi-automatic handgun. When Mr. Crowe asked what she had said and stepped closer, the Defendant pointed the gun at Mr. Crowe and threatened to shoot him.

Mrs. Crowe reported in her victim impact statement that the town's airport was located behind their house and that June 13 was the day of the airport's annual fly-in breakfast. She stated that before the Defendant brandished her gun, "[e]very time a plane flew over the house that day [the Defendant] threw herself on the ground as if she was under attack." The stalking and violation of the order of protection charges arose from the Defendant's following and photographing Mr. and Mrs. Crowe. Mrs. Crowe reported that

she was with her two sons in her vehicle at a park when the victim pulled up behind her, began photographing her license plate, and then followed her vehicle as she was leaving the park. Mr. Crowe reported that he was exiting his house when the Defendant walked across the street to his property and began photographing him and his vehicle.

Also included in the presentence report was the statement of Investigator Steve Wilson of the Clifton Police Department, who expressed his belief that the Defendant "suffer[ed] from some type of mental disorder" and posed a danger to the community. Investigator Wilson described the Defendant's habit of wearing "camo" clothing with ballistic vest and combat helmet and making "outlandish claims" in repeated 911 calls and provided a list of the dates and content of those calls. He stated that approximately a year prior, the Defendant informed him that the Russians were tampering with her phone and computer because she had just ended her romantic relationship with Russian President Putin, "causing Vlad some distress." According to Investigator Wilson, a few days prior to the June 13 incident, the Defendant had been following Clifton Police Officer Newcomb around town while dressed in her military garb and had also been "driving out in front of Officer Newcomb[']s shop harassing or stalking him[.]"

Tennessee Department of Correction Probation and Parole Officer Bethany Sisseck, who prepared the Defendant's presentence report, testified that the Defendant did not accept any responsibility for her actions. The Defendant's exact words, which she recorded in the presentence report, were: "I was not involved; I did not commit a crime." She testified that the Defendant's probationary sentence on judicial diversion had been revoked based on her new charges of two counts of stalking and two violations of an order of protection, with the victims in the new charges the same as the victims in the original offenses. She stated that the aggravated assault incident occurred in the victims' yard in Clifton with the victims' children present.

Officer Sisseck testified that the Defendant would not sign a release of information form, which meant that Officer Sisseck was unable to verify any of the education the Defendant listed in her personal questionnaire, other than that the schools existed. She stated that the Defendant provided her employment information, including her most recent employment in online technical support with a company called "Working Solutions," which Officer Sisseck was able to verify by the employment contract that the Defendant provided. The Defendant had other online jobs listed, but Officer Sisseck was unable to verify those positions.

Officer Sisseck testified that as part of the Strong R assessment, "it was recommended that [the Defendant] speak with the social worker and have an assessment done." However, the Defendant was arrested on the new charges before that assessment

could be performed. Officer Sisseck testified that she had not spoken to the Defendant regarding her new charges.

On cross-examination, Officer Sisseck acknowledged that the Defendant had no criminal history prior to the incidents in Wayne County. She said she spoke with the Defendant upon her intake at the jail after the stalking incidents and the Defendant was still taking her mental health medications of Effexor and Wellbutrin at that time. She had no knowledge of whether the Defendant was currently taking those medications. She agreed that the Defendant's Strong-R assessment, completed prior to the Defendant's being placed on probation, showed the Defendant with a low risk for offending. She disagreed that the score was due to the Defendant's having sought treatment for her mental health issues, testifying that it would have been based on the Defendant's lack of prior criminal history and what the Defendant reported. She acknowledged that the Defendant owned her own home and had a job at the time of her most recent arrest.

On redirect examination, Officer Sisseck testified that, to her knowledge, the Defendant had no family in Wayne County. She said the Defendant told her that she had a sister in Michigan but her only contact with family was with a cousin in Chattanooga.

Upon further questioning by the trial court, Officer Sisseck testified that the Defendant told her that she was not comfortable signing the release of information form. She said the Defendant informed her that she had obtained a law degree in a little under two years but had never sat for a bar examination. The Defendant did not tell her when she had last seen a physician. However, the Defendant reported that her mental health was excellent. The Defendant also self-reported that she had been diagnosed with depression, that she was taking her mental health medication, and that she had had one in-patient hospitalization in the past. Officer Sisseck testified that she had no information regarding where or why the Defendant had been hospitalized. She agreed that the Defendant, in filling out the forms for her Strong-R assessment, reported that she uses self-control, thinks before acting, has adequate social skills, generally respects authority, and respects the property of others. The Defendant denied that she had done anything wrong and believed herself to be "the one being harassed and . . . followed by someone."

The Defendant testified that she had never had any criminal charges other than the ones related to the instant case. She said she earned a bachelor's degree in music from Valparaiso University, master's degrees in psychology and Christian leadership from Fuller Seminary in California, which she attended in person from 2002 to 2008, and an online law degree from Novus Law School, which she began in 2008 and from which she graduated in 2010. She explained that her reluctance to sign the release of information form was due to the way that information had "gotten twisted" "by the victims as well as

what are in these reports," resulting in "a lot of false information[.]"  She stated that she would have signed the form had she known of the impact of her failure to sign it, and she expressed her willingness to sign the form at the hearing.

The Defendant testified that for approximately three and a half years during the time she was attending Fuller Seminary in California, she worked for ADT Security as an armed patrol officer.  She recalled that she lived in Illinois when she attended Novus Law School, which she said was an online law school.  She stated that after she completed law school, she lived in North Carolina and worked for approximately a year and a half at "the Mentor Network" as a "mental health professional with children."  She then moved to West Virginia, where she worked for approximately three months as a mental health counselor at a "drug alcohol center" and then for a temporary agency doing clerical jobs.

The Defendant testified that, although "fuzzy" on the dates, she believed that she moved to Tennessee in 2014.  She said she first lived in Knoxville, where she worked for approximately three months as a mental health counselor at "Florence Crittenton[,]" a facility that treats mental health in children.  Afterward, she remained in Knoxville working temporary jobs until she eventually moved to Clifton in 2017.  The Defendant explained that she moved to Clifton because she was having trouble affording her apartment in Knoxville and needed a place without monthly payments.  She said she lived in a camper on property she bought in Clifton, and that she had no mortgage.  At the time she moved to Clifton, she had an online job as a teacher of English as a second language.  The Defendant stated that she had been doing online work for approximately the past seven years, primarily in customer service and technical support.  She said she had just started her job with Working Solutions at the time of her latest arrest.  She stated that she had cousins in Chattanooga and a sister in Michigan, but her relationship with her sister was estranged.

The Defendant testified that she was currently taking venlafaxine for depression and Claritin for her allergies.  When not incarcerated, she took Seroquel for insomnia, Anoro for asthma, and the inhaler Singulair.  The Defendant testified that she was unable to get those medications while in the jail and that her asthma had worsened as a result.

When asked if there was anything else she wanted the court to know, the Defendant testified that she wanted to reiterate what she had said at the revocation hearing and related how she had been harassed and stalked for the past two years:

> But I have been stalked for a period of two years.  I have had B.B.s and, like, rubber bullets hit my trailer.  And I have had - - I have been followed in my car in a couple of incidents.  And it's been very traumatic.  I

mean, the past incident - - the most recent incident happened the night before I was arrested, actually. There were two objects that hit my window.

And then also I was driving to Walmart and there was a car kind of playing chicken with me. And I - - before this all happened, I didn't have a concealed weapon[] permit but I - - I was very scared, I mean, at the time. And I still am because I don't - - I don't know what it is or anything.

And in regards to what happened this time, like I said, I, when I drove to the park, I was just going to exercise and I was just - - I had my dog with me and there was a black SUV. I had no idea who was in it but the vehicle was running and I was scared. I felt that they might be stalking me and that's the only reason why I pulled behind the vehicle and tried to get a picture of their plate but I couldn't and then I just pulled back and I - - I continued my exercising. And I even have pictures that of a boat in the water. And I in no way, in no sense followed anybody around the parking lot. I was going to call the police, actually.

And the other incident, that didn't even occur. So - - we've talked about it. And I never pointed a gun at anyone, either.

The Defendant acknowledged having asserted that she was running for president and indicated that it was the truth, testifying that she had been running as an independent and that "[t]he state of Tennessee might even have a record" of her having requested the required signature petition. She also acknowledged having asserted that she had been in a relationship with Vladimir Putin, although she did not recall having made that assertion in a 911 call. She testified that she believed at the time that she had been in a relationship with Mr. Putin. She went on to explain that she had tried to have a relationship with him for approximately seven years but "there was no contact back" so she was now unsure about the relationship. She said she stopped trying to have a relationship with him approximately a year prior to the hearing.

When asked if she thought mental health counseling or treatment would have helped, she replied that she thought "that issue [her perception of being in a relationship with the Russian president] ha[d] cleared up" but she would "love to get counseling." She stated that she believed she had been suffering from "P.T.S.D." two years earlier, but she had obtained "some counseling" during the time the case was "just lingering" and believed that she no longer had P.T.S.D. She said she honestly believed that someone was stalking her, and that she still believed that to be the case. She expressed her willingness to attend

counseling and to take her mental health medication as a condition of any probation granted by the trial court.

On cross-examination, the Defendant testified that she first began being stalked in June of 2020. She said she had no idea who was stalking her. She denied that she ever reported to the police or a 911 dispatcher her belief that Vladimir Putin might have sent someone to kill her. She also denied that she ever pointed a gun at anyone. She admitted, however, that she had carried a gun and sometimes wore a military vest and combat helmet, testifying that she was scared for her life. She stated that she obtained her concealed carry permit in 2016 when she was living in Knoxville. When asked if she had a psychological diagnosis, she replied that she had been diagnosed with "[m]ajor depression." She said she was under the care of a physician at Lifespan Savannah, and that she went there "maybe once every three months or six months."

On redirect examination, the Defendant testified that she had switched medical providers, and that she had given Officer Sisseck the name of the nurse practitioner she was seeing at the time of the presentence report. She did not know why Officer Sisseck failed to contact the nurse practitioner "in regards to what medications" she was on.

Upon questioning by the trial court, the Defendant testified that she was having trouble recalling the name of the medical provider who had last prescribed her mental health medication. She acknowledged having made thirteen 911 calls over a short period of time but did not recall some of the statements she was reported to have made in those calls. She testified that she had worked as a counselor because she had a master's degree in psychology and enjoyed helping people, but she admitted that she had never been a licensed counselor. She acknowledged that she had moved from job to job and that she had been terminated from some of her positions. She said her inpatient hospitalization occurred in 1993 during her junior year of high school, when she spent thirty days at St. Francis Hospital. She stated that she was diagnosed with bipolar disorder, but, according to the "doctor's note[,]" it was actually just a bad reaction to an acne medication that she had been taking. She denied that she had ever been diagnosed with paranoia, schizophrenia, or any other similar mental health disorder.

The prosecutor proposed as enhancement factors that the risk of likelihood of harm to the victims was great and that there were multiple victims, *see* Tennessee Code Annotated §40-35-114 (3), (10), and argued that a sentence of confinement was necessary to protect the community from the obviously mentally ill Defendant. Defense counsel acknowledged that the Defendant suffered from some sort of mental illness and proposed as mitigating factors that substantial grounds existed tending to excuse or justify the Defendant's criminal conduct, though failing to establish a defense, and that the Defendant

was suffering from a mental or physical condition that significantly reduced her culpability for the offense. *See id.* at §40-35-113 (3), (8). Defense counsel expressed her opinion that the Defendant's mental health needs would not be addressed in prison or jail and requested that the trial court sentence the Defendant to probation with the express condition that she comply with mental health treatment. In the alternative, defense counsel requested a sentence of split confinement.

The trial court found both proposed enhancement factors applicable and assigned each enhancement factor great weight. The trial court found that the proposed mitigating factors were "probably accurate except that [the Defendant]" did not "have a clue that they exist in her favor[.]" Although not explicitly stated, the trial court apparently assigned little to no weight to those proposed mitigating factors. The trial court found that the Defendant was eligible for probation but that a sentence of probation would unduly depreciate the seriousness of the offenses and fail to protect the community from the Defendant's dangerous behavior. In reaching this determination, the trial court noted, among other things: the serious nature of the offenses, in which the Defendant brandished a semi-automatic handgun with multiple individuals, including the victims' children, in the vicinity; the Defendant's obvious paranoia, lack of self-awareness of her mental health issues; failure to accept any responsibility for her actions, and failure to comply with the terms of her judicial diversion; the Defendant's perception of herself as a victim and her repeated bizarre and dangerous behavior; and the threat to the community posed by the Defendant if the Defendant were to be released on probation. The trial court found that the Defendant was obviously suffering from a very serious mental illness and that it did not reasonably appear that the Defendant would comply with any mental health conditions of a sentence of probation, given her history and her statements to the probation officer that her mental health was excellent. Accordingly, the trial court sentenced the Defendant as a Range I, standard offender to concurrent terms of five years for the aggravated assault conviction and two years for the reckless endangerment conviction and ordered that the Defendant serve the effective five-year sentence in the Tennessee Department of Correction.

The trial court expressed concern that the Defendant receive a mental health assessment and appropriate mental health treatment while in the custody of the Tennessee Department of Correction. Therefore, under the "Special Conditions" of the judgments, the trial court included the following "safe-keeping" language: "The Defendant is considered a harm to herself and others. An immediate mental health assessment is ordered. Special needs is recommended." Also included in the special conditions was a prohibition against the Defendant's having any contact with the victims or their family.

## ANALYSIS

The Defendant argues on appeal that the trial court imposed an excessive sentence and erred by denying her request for probation or a sentence of split confinement.

A trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range and the sentencing decision of the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *State v. Bise*, 380 S.W.3d 682, 709-10 (Tenn. 2012). The sentence imposed should be (1) "no greater than that deserved for the offense committed" and (2) "the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" Tenn. Code Ann. § 40-35-103(2), (4).

A defendant is eligible for probation if the sentence actually imposed is ten years or less. *See id.* at § 40-35-303(a). A defendant "who is an especially mitigated or standard

offender convicted of a Class C, D, or E felony, should be considered a favorable candidate for alternative sentencing in the absence of evidence to the contrary[.]" *Id.* at § 40-35-102(6)(A). The following sentencing considerations may constitute "evidence to the contrary":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

*Id.* at § 40-35-103 (1). Additionally, a court should consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. *See id.* § 40-35-103(5). A defendant "evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration[.]" *Id.* at § 40-35-102(5).

The Defendant contends that the trial court erred in sentencing her to five years in the Tennessee Department of Correction because she demonstrated that she was a suitable candidate for probation and the trial court failed to consider whether a sentence of incarceration would provide an effective deterrent to others likely to commit similar offenses. In support of her assertion that she was a suitable candidate for probation, the Defendant cites her lack of any prior criminal history, her advanced degrees, the fact that she has had no issues finding online employment, and the fact that she owns her own property. The State points out that the trial court did not weigh the deterrence factor against the Defendant, and argues that the trial court acted "well within its discretion in concluding that the defendant's poor potential for rehabilitation and the seriousness of the offense did not support a grant of probation."

We agree with the State. The record reflects that in denying probation and ordering a sentence of confinement, the trial court considered the sentencing guidelines, the facts and circumstances surrounding the offenses, the presentence report, and the testimony of the probation officer and the Defendant, both of which demonstrated that the Defendant failed to acknowledge any responsibility for her actions, continued to see herself as a victim, and had no self-awareness as to the severity of her mental illness. The trial court also considered the Defendant's failure to abide by the conditions of her judicial diversion

and the danger she posed to the community, making findings for the record that a sentence of confinement was necessary to avoid depreciating the seriousness of the offense and to protect the community from the Defendant's erratic and dangerous behavior. Accordingly, we conclude that that trial court did not abuse its discretion in imposing an effective five-year sentence in confinement.

## CONCLUSION

Based on our review, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE